The next case is Enlow v. Morris, 524-1259, Mr. Daniel, Ms. Scott, Ms. Epley, Mr. Daniel, Mr. Scott, Ms. Epley, Mr. Daniel, Ms. Epley, Mr. Scott, Ms. Epley, Mr. Scott, Ms. Epley, Mr. Daniel, Ms. Epley, Mr. Scott, Ms. Epley, Mr. Scott, Ms. Epley, Mr. Scott, Ms. Epley, Morris and his wife, Reverend Dr. Karen Morris. Presenting Justice Case, Justice Barbera, Justice McKinney, I'd like to make three quick points right off the top that consolidate into one central point for this case went awry on the trial court. In our opening brief, we cite three things, page 11, lines 10-15, Enloe told Stedman-Williams she owned 2001 5th Street. Page 21, lines 3-6, Stedman-Williams believed April Enloe owned that property and thirdly, the next page, 22, lines 4-7, Stedman's impression was that April Enloe owned the property and he would not have made the improvements had she not owned the property, they would have moved somewhere else and he never saw a deed with her name in it. So those three points sum up how this case all began with April Enloe's dissembling to her boyfriend that she owned 2001 5th Street and it all spiraled down from there. The only operative deed of ownership to the subject property, which is next door to 2005 5th Street where my clients live, this is the next door property on the corner. It's in our opening brief appendix, it's the recorder certified quick claim deed from Jimmy D. Van Vliet for the Van Vliet Estate to Karen E. Morris and Orito Morris dated March 23, 2018. Morris' simply seek to preserve their ownership of their own property by preventing it from being taken away by their daughter April Enloe and her living boyfriend Stedman-Williams, neither of whom, Williams or Enloe, had any deed or ever had a deed to 2001 5th Street in the city of Madison, Madison County, Illinois. The facts that require legally sufficient facts for the trial court's ruling are not there in this case. They never were. Enloe seems to have abandoned the case law underpinnings to their claims for one specific performance and two suit to quiet title. These were in their proposed form earlier in the case where they, the other side cited Anastopolo v. Radford and Ashlethorne v. Willis, 67 and 123 year old cases stood for the proposition that it would amount to some type of fraud to repudiate a contract after some measure of partial performance in making improvements to the property. There's no mention of the Radford or Willis case in Enloe's appellee's brief. No fraud was proved at trial in the two day bench trial. No fraud count was alleged in the pleadings. Only the two counts, quiet title and specific performance. Mr. Daniel, can I ask you a question? Are you saying that there was no contract in this case to sell the property? Absolutely no contract ever. No contract, no signed writing, no notes on the paper napkin, nothing. There was payment made though, wasn't there? Yes, $300 a month for a limited period of months. What was that for? That was for, as is testified in court by Reverend Morris, that was to teach their daughter at only $300 a month, teach their daughter how to spend more wisely after her car had been repossessed and to learn to move to the next level of adult financial responsibility. It was never rent, it was never a bond for deed payment, it was never a mortgage payment, it was never any of those things. And that money was used for the granddaughter's private education, not for the housing at all. Wasn't the car repossessed after she had started making payments at the house? I'm not sure of the date. The way I read the transcript was that they kept the property in the parent's name, never deeding the property to the daughter because they did not want to risk the house. I believe you're right. Matt, will you bring that up? I think that was the correct sequence, too. The sequence was that they didn't want to put the deed in anybody else's name while there was potential for the bank to come after her for any other assets. Right, they did not want to lose their house. If your clients testify that that was the reason they didn't put the deed in the daughter's name, correct, doesn't that indicate that they had intended to put the deed into the daughter's name but for the financial difficulties she was in? No, it does not. I don't think that's a correct inference to draw. It's to have kept the property in their name so that it couldn't be taken by foreclosure or repossession or it's a mobile home trailer. So the only reason it could have been taken if it were in the daughter's name was if they were going to put it in the daughter's name. So then why was there any discussion about whether or not to put it in the daughter's name if that was never in contemplation? It was never in the parent's contemplation. But weren't the ones that testified to not putting it in the daughter's name? Or am I mistaken on that? Was it the daughter's testimony? No, it was the mother's testimony that the $300 a month for $850 a month reasonable rental, the $300 a month would be to teach her how to manage finances like an adult, not having anything to do with purchase of the house, the mobile home. I think we're getting off the topic of the title to the mobile home or the property. It was the mother's testimony was we did not put the deed or the title into my daughter's name because she had financial difficulties and we didn't want that to potentially be taken from her. Correct. And that implies to me that but for that financial difficulties that the daughter was going through, it was mother's intention to put the deed or title into the daughter's name. Well, that's reading tea leaves, Your Honor, and that's one way to look at it. The way the Morris parents look at it was they were never going to let her have something that could be taken from them because it was theirs. They had bought it from their dear friends, the Van Vliet neighbors, and it's functional in the city of Madison and Madison County. That was the Morris's 401k, as you will. It was their retirement that day after their daughter had grown up and had finally moved on. So that was the genesis of that. Justice McCain? Didn't the trial court make a credibility finding against your clients? Yes, yes. Why did we not give that deference? Because that deference was explained in testimony. If you would envision, as we all can, as lawyers and justices, a deposition page with the page number in the upper right-hand corner and then the usual four-to-a-page printed out in the deposition transcript with each of the four pages. There are four numbered pages with 24 lines on each of four pages. We refer to that, too, as page-in-line responses. But then those trial lawyers kept beating Karen Morris up about page-in-paragraph with page-in-paragraph reference on different pages, which was confusing to the lay witness. It was not, as Associate Judge Motel described it, Your Honor, as deliberately trying to not answer. She couldn't answer a question she doesn't understand because there were different page numbers and page-in-paragraph references. She was confused, and that was on the record. So I believe that explains why the credibility determination by the Associate Circuit Court was off the mark. It did not reflect what actually was occurring in the courtroom. I believe, Your Honor. The testimony, though, is that the daughter paid at least $8,000 of this sale price. Of the $11,000 sale price, there are two versions. One, which we give full credit to, assume it's correct. $8,100 toward $11,000 is only 73%. It's nowhere near full price. Regardless, it acknowledges the fact that there was a promise to pay when you have 81, even 73%, there's a promise to pay some amount toward this trailer, right? Right. That's the Enloe version of the payments. The Morris version, who received the $300 payments, was that it was $4,200 total. So only 38% of... What was the $4,200 for? That was $300 a month for a certain number of months that added up to $4,200. And then she just stopped making payments when Stedman-Williams moved in. To be consistent, she told him she owned the place when she did that. The question people have asked is, why is she making payments if she already owns it? So she had to stick with that lie and stop making payments. Far short of the $11,000 price, which was not agreed to by Karen Morris, was not agreed to or talked about with Orito Morris, the two owners of the property, and was only talked about in the middle of this case when these counterclaims, which converted into Cots 1 and 2 of a complaint, came to the fore. Is there any acknowledgment that her mother agreed to this $11,000 price? No, that was plagiarized from the Van Vliet general contract, which is in our appendix, for the deed that Morris was acquired from Van Vliet. There was never a separate written agreement, not a note on a napkin, not a memo of understanding, nothing from Morris to Enloe. So they just made up, well, we got the same deal that they gave them, which never occurred. Did the daughter, at the end of making payments, regardless of what the last payment amounted to, if it was the $4,200 or $8,100, regardless of that, at the end of those $300 a month payments, did the daughter also turn over a tax refund or something of that nature to her mother? No. As a final payment? I think that's how it was phrased. No, what occurred was that the Morrises always made the payments. There was never seven consecutive years of tax payments to gain possession, no 20 years of adverse possession. And on the so-called final payment, there was a refund made back to Morrises so that the squatter, admitted squatter, Stedman Williams, could not take that avenue toward taking the next-door property. Okay, so those $300 a month payments lasted over what period of time? In 2016 and 2017, it's in our brief, the exact number of months equals $4,200 or the other, a longer period of time, but nowhere near full payment. It was a longer period of time, the same $300 a month, until the payments just simply stopped coming. I recall this from the briefs. Was there a party at the daughter's house after the last payment to celebrate homeownership? Two versions on that. Williams and Enloe claimed there was a house payoff party. It was not. It was just a family gathering. And what Morrises' position is, there was never a house payoff like burning the mortgage. There was never any such thing. There had been a house warming party when Morrises first got it from Van Vliet, but it was a mischaracterization made up after the fact to say, well, that was a house payoff party. It was not. It was a family gathering. Months down the road in litigation, somebody decided to call it a house payoff party. It was not. When you make that representation that this was made up, where do you get that from? I get that from what's alleged in the counterclaims, which became the complaint, were lifted or plagiarized from the Van Vliet general contract appendix to our brief. That's Van Vliet to Morris. They just copied those same terms. That doesn't talk about a house warming party, does it? Does what? A house warming party or a house payoff party? A mortgage payoff party. I'm concerned about you making allegations that somebody made something up. Correct. I consider Miller was assigned writing between these parties. But you can have an oral contract between the parties and partial performance that takes it out of the statute of frauds. It can if it's sufficient. Well, what's sufficient? $8,100? $4,300? Neither, because that's only 38%, 73%. You don't get to buy anything at that kind of discount. Who is to determine whether the partial performance is sufficient under the oral contract? It's easy to determine if there's a signed written contract. But I didn't ask that. I asked about the oral contract. Right. On the oral contract, it's amazing how the enrolled alleged oral contract with her mother, not with her father, who's a co-owner, mirrors the Van Vliet to Morris contract. They just said, well, we got the same deal they got, which never occurred. Well, it never occurred according to your client. That's correct. Okay. Questions? Questions? All right, Mr. Daniel, you're out of time for right now, but you'll have a chance to come back and do rebuttal.  All right, that's his reserve. Thank you. Ms. Scott, do you want to give him a moment? Yes. We'll hear from you. Good morning, Justices, and may it please the Court in opposing counsel. My name is Catherine B. Scott, and I represent Apelli April Inlow. This case is about a mother, Karen Morris, who can't let go of her daughter or her granddaughter, so much so that when April Inlow tried to move out of Karen Morris' home, Karen Morris financed and facilitated the purchase of a recently deceased next-door neighbor's home for April. Karen Morris convinced April to stay right next door with the promise of fast and affordable home ownership. Karen Morris walked April through the process of buying her first home. She calculated payments that April could afford. How old was April at that time? April was 24, I believe. She was a young mother, and she relied on her mother, Karen Morris, for everything. Testimony shows that they were best friends. April considered Karen Morris to be her spiritual leader, and Karen Morris had helped her on multiple occasions to come up with payment plans that were not so different than this one. Never in writing, always cash payments. Karen Morris refused to let go after April had made all of the payments on their oral contract. This time, she refused to let go of the deed for the land and the title to April's first home. Okay, let me stop you there. With regard to your statement that April made all of the payments as agreed, was that $11,000? Was that $8,200? Was that $4,700? In other words, what was the total payment that April is alleged to have made? April testified to making at least $8,100 in payments. She testified that while her recollection is fuzzy going back to 2016, she knows that she made her final payment with a portion of her 2018 tax return. And as previously discussed in opposing counsel's argument, there was a housewarming party. So, let me stop. With regard to the final payment being made from her tax refund, did that bring it to the $8,100 or did that bring it to the $10,000 or the $11,000? The truth is we don't know. And that's because Karen Morris testified that April stopped paying the $300 monthly payments not because April wouldn't pay, but it was because she and her husband agreed, and I quote, that April had did so good for a year that we wouldn't continue to have her give anything else. So, to the extent that she didn't pay the full purchase price, it was because her mom and dad told her to stop making payments. And they cannot now today argue that she didn't make full payment so that they can deprive her of the deed and title of her land and home and control of that. Because this case is ultimately about control. The standard of review in this case is manifest rate of the evidence. And because it's an oral contract, this court has held that it is the trial court who is in the best position to judge the credibility and the conduct of the witnesses and to determine what the intent of the parties in the oral contract were. And in this case, the trial judge held that there was a valid and enforceable oral contract, that April Inland did make sufficient payment to take the oral contract out of the statute of frauds. Counsel, did the trial court use the wrong legal standard? Admittedly, appellee's counsel, me, argued the wrong burden of proof. We argued that it was by the components of the evidence. But the correct standard is clear and convincing evidence. In this case, though, Is it clear and convincing or manifest weight? Oh, I'm very sorry. The standard of review is manifest weight of the evidence. The burden of proof is clear and convincing. Thank you, Justice Cates. What's that standard of review in this case? Manifest weight of the evidence. And this court in People v. Hayes, which I believe was decided last year, decided that when a circuit court applies the incorrect standard, this court may affirm the judgment if it would have been the same under the correct standard. So while we argued that the evidence met the claims by the components of the evidence, there is an overwhelming amount of credible evidence in support of appellee's claims. And because of that, this court can affirm the trial court's judgment. Touching on credibility determinations, this court found that Karen Morris was not credible. She admitted in trial, in depositions, that April paid her $300 a month for a period of time. But her testimony regarding the total amount paid was riddled with inconsistencies. In a deposition, she claimed that April paid her $4,000. But in a verified pleading, she said that April paid her $6,000. And in a trial, she testified that April paid her $4,200. When asked of these inconsistencies on cross-examination, Karen Morris repeatedly evaded direct answers because she didn't want to answer the questions. And it wasn't that Karen Morris was confused. In fact, the judge had to stop proceedings to tell her to stop being difficult. And he impeached her multiple times for inconsistent testimony. In many of the findings of fact, the trial court considered her pattern of inconsistent statements and evasive conduct, which severely undermined her credibility. And in contrast to April's good chronology of how things went, the trial court believed April. Specific performance is warranted in this case. The Illinois Supreme Court held in Pocus v. Flex that when a party is asking for specific performance of a contract, it must show the terms of the contract were certain, definite, and unequivocal. Here, the trial court determined there was a meeting of the minds as to the identity of the property and to the purchase price. Purchase price was corroborated by an uninterested witness, Jimmy Van Fleet, who testified that he remembers that the purchase price was $10,000 because he thought it was way too low, and he thought his sister was getting scammed by Karen Morris. What do you do when the purchase price is unpaid, though? What we do is we invoke the equitable estoppel in that. Essentially, what the appellants are doing today is they're saying, oh, the full purchase price wasn't paid. But they didn't say anything when she had her housewarming party, which, by the way, was not when April first moved in, because another uninterested witness, Mr. Derek Flynn, a journeyman contractor who helped with the renovations, was there. He testified that he went to that housewarming party with his daughter, and he hadn't even met April in 2016 when she moved in. April met Derek through Stedman, who moved in in 2020. And what we do is we ask ourselves, why did Karen Morris go to that housewarming party? And listen to April telling everybody, this is my house. We've got the music running. She's so excited. She made her final payment. People gave her presents. Karen Morris didn't say anything, and neither did Aretha Morris, who knew exactly what was going on. Okay, but my question is, what do we do legally when we can identify a contract, an oral contract? And now the terms have to be specific. We know that there was not the full amount paid. In fact, we don't really know how much was paid. So how do we enforce that contract? Through equitable estoppel. And how would that operate in this case? In this case, it operates in that... We just give her the property? I think, ultimately, that's where we land, is that she gets to keep the property that she's in possession of. But in this case, April... As I stated before, it was Karen who told April to stop making the payments. And so when she made that statement, she was fully aware of that statement that she was making, and the implications and the reasonable understanding that her daughter would have, that she was done making her payments, and that she owned the property. And what we do with equitable estoppel is we say that... We say that it is unfair for a person to lead another person into believing that they have a right, and then after the fact, taking... Taking the rug out from underneath her daughter, in this case's feet, and saying, uh-uh-uh, not so fast, you didn't make all the payments. And estoppel can arise from silence as well as words. It may arise where there's a duty to speak and the party on whom the duty rests was in an opportunity to speak and knowingly kept silent. And in this case, both Orito Morris and Karen Morris kept silent. They kept silent at the housewarming party. They kept silent as she was making tens of thousands of dollars in repairs to a property that she didn't want initially. It was an outdated mobile home. But when Shane Stedman, her long-term partner and father of her child, decided to make the best of what they had, they started with the master bathroom. They then made renovations to their own bedroom. Then moving into the kitchen, they completely redid the kitchen. And the living room. And there's a lot of evidence of this. And the trial court made a determination that they were very nice improvements. So let me stop you there. Just two issues. One, so what you're suggesting then is because mother and ostensibly father waived any further payments on the contract, that she's not obligated to pay any further. And two, is there a dispute as to whether or not mother was actually at the housewarming party? For some reason it's clicking that I read. Maybe not. Disputes ever been there. So Karen Morris says that she was not at the party. But the trial court disregarded her testimony as inconsistent. And so to the extent that there is a dispute, the trial court found that the evidence was uncontroverted because any disputed testimony was unreliable. So with regard to her presence at, and I don't know how much bearing this really has on our decision, but with regard to her presence at the housewarming party, was there any other testimony that the trial court heard from anyone other than the daughter that mom was there? Derrick Flynn testified that Karen Morris was there. He said that he thought that Rita was there, but he wasn't sure, but he was sure that Karen was there. Okay. And in light of the clear and convincing evidence that was presented throughout this case, it's unmistakable that April fulfilled her obligations under the oral contract with her mother, that she made substantial improvements to the property in reliance on her belief that she had fulfilled her contract, and that she acted in good faith with the understanding that she was the rightful owner. The trial court's findings are firmly anchored in credible testimony and evidence and a thorough assessment of the party's conduct. After a two-day trial and six witnesses. To deny April the relief she seeks today would not only undermine the integrity of the judicial process, but also unjustly strip her of the home that she devoted time, effort, and resources to create for her family. We are left with the same question before the trial court when it moved from the bench, asking, why would April and Stenman be making all of these improvements to the property if they didn't believe it was theirs? So if we decided against your client and say she's not entitled to the property, and that she's entitled to a refund of any payments that she made, and let's just start with the rent, or the mortgage payment, not the repairs, what would she be able to prove through records or evidence? How much did she pay? In this case, there aren't a lot of records, because, and that was by design. As I said, Karen Morris does everything in cash, and it was by design that there was no written agreement. What April would be able to do with that refund, if you will, is not much. In this day and age, you can't really do a lot with $8,000. And also, she put sweat and tears and picked out specifics, like the cabinets that she wanted, the paint color. She picked out the tile in the bathroom. She can't, what she and Stenman created cannot be recreated. Thus the basis for the equitable stop. Yes. Right. Okay, just one moment, we're out of time. No questions. Okay, do you have a sentence you want to wrap up with? We ask that this court affirm the trial court's judgment in favor of April Ingram's claims to quiet title and for specific performance. We ask that this court uphold the judgment, because it is not against the manifest weight of evidence. There was a lot of evidence in favor of April's claims. Thank you. All right, thank you very much, Ms. Scott. Mr. McDaniel, rebuttal. Yes, your honors, in my five minutes for rebuttal, I want to finish two quick points, and then talk about policy reasons why reversal should occur in this case. One, Morris never sued for $300 a month for any remaining payments to enforce an oral contract, because there was no oral contract. Secondly, there was the unrebutted sworn testimony that Stenman Williams was a squatter, someone sitting under the state without fully paying for it. In Morris' appellate's opening brief, two different places, page 25, lines 2 through 3, citing the supplemental record, page 263, line 17. Is Stenman claiming ownership of the property? Is Stenman claiming any ownership of the property? He's not yet. Okay, so then is he a squatter, or is he an invitee of April? Well, according to him, he's a squatter. Oh, okay. Seeking to do it. That's why on page 25, lines 2 through 3, and on our brief, page 26, line 19, at the bottom, through the top of page 27, line 1 and 2. So as a squatter, is he claiming ownership from April as well? Is he saying April can't get rid of him either? That never became an issue because they're living together and he's the baby daddy of her second daughter. Mr. Daniel, what does him being a squatter have to do with this case? Okay, neither Stenman nor Enloe ever took the witness stand to deny or contest or attempt to refute that he was a squatter. What does that have to do with the enforcement of an oral contract? It shows his puppet strings on April Enloe to have her proceed with this action to try and get a house that she nor he nor they ever paid fully for. The allegations that you make during your argument are a little concerning to me because you're going outside the record to talk about something that is not in the record where you say he's got puppet strings on April. Is that in the record? That one part is not in the record, but it's clear. But you're making an allegation about somebody's conduct. We're not here today, but he attended every court hearing and every defense trial. So what? How does that have to do with the enforcement of an oral contract? I'm only worried about the way you make allegations and the impropriety, if you will, of doing that before the court. His motivation was her motivation, starting with when she lied to him and said she owned the property. From then on, they were teamed up and were working to take this property from her parents. Well, obviously you haven't got the meaning of what I'm talking to you about. So let's go on. Go ahead. All right. Policy argument. This is what happens in intra-family real estate transactions where they don't get it in writing. That aside, which is central to how this devolved, the reasons for reversing the Madison County Associate Circuit Court are what would be next if Enloe succeeds in taking her parents' property and the judge giving the daughter her parents' property. Imagine the thousands of bonds for deed buyers in Madison and St. Clair counties hearing about this case thinking, well, we didn't get it in writing. We can make up something verbal. We paid less than half. $4,200 of $11,000 is 38 percent. Or maybe something over half, $8,100 of $11,000 is 73 percent. And we did some fix-up and some improvement. And then we had these actions to try and take the property without full payment. I believe we should hold to the traditional principles that you do not get what you do not pay for. If we were to open these floodgates for litigating buyers to inundate the courts with their own Enloe discount that they'd be looking for, that would result, gone would be the sanctity of contract. Out, there never would have to be a meeting of the minds because there wasn't here between mother and daughter and certainly not between daughter and father. Lastly, from page 33 of our Boris brief, lines 4 and 5, Enloe, with the conflicting evidence, which happens in this kind of intrafamilial case, Enloe may have had a foot to stand on, a foot, I'm sorry, Enloe may have had a foot in the door, but not enough, not a leg to stand on. It's just too much of a stretch for a court to take the parent's property and give it to the daughter on the underperformance of an alleged, not proven, contract. Thank you very much. Thank you. Questions? No questions. All right, that concludes the testimony in Enloe v. Morris. We'll take the matter under advisement and we'll issue an order in due course. Appreciate your arguments here today.